# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 24, 2012 Session

## AARON BISSINGER, ET AL. v. NEW COUNTRY BUFFET, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 06C2413      Hamilton V. Gayden, Jr., Judge**

———————————————

**No. M2011-02183-COA-R9-CV - Filed June 6, 2014**

———————————————

A man who suffered a blood infection after eating raw summer oysters at a Nashville restaurant filed suit against the restaurant, claiming that the oysters were contaminated because they were kept at an improper temperature.  The restaurant owner answered, and among other things he named three companies in the supply chain that furnished the oysters to the defendant restaurant as possibly liable under the doctrine of comparative fault.  The plaintiff subsequently died, and his executor was substituted as plaintiff.  The executor filed an amended complaint that added the suppliers as defendants, and included claims against all the defendants of negligence, negligence per se, product liability, and breach of warranty.  All the parties filed motions for summary judgment.  The trial court denied the defendant restaurant's motion for summary judgment, but it granted summary judgment to the defendant suppliers on all issues except failure to warn.  After studying the voluminous record in this case, we affirm all the trial court's rulings on the summary motions against the restaurant.  We affirm the trial court's grant of summary judgment to the suppliers, and reverse the denial of summary judgment to them for failure  to warn.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
## Affirmed in Part, Reversed in Part

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Kathryn Elaine Barnett, Christopher Eric Coleman, Jonathan Lewis Williams, Kenneth Sherman Byrd, Nashville, Tennessee, for the appellant, Aaron Bissinger, Executor of the Estate of Randall Bissinger, Deceased.

–1–

Warren Maxey Smith, Harold Richard Donnelly, Jack Paul Brewer, Judith Elizabeth Lojek, Nashville, Tennessee; David Jackson Sneed, Franklin, Tennessee for the appellees, New Country Buffet, Shao Chai Chen, individually and d/b/a New Country Buffet, Gulf Pride Seafood of Franklin, LLC, Leavins Seafood, Inc., Bon Secour Fisheries, Inc.

## OPINION

### I. BACKGROUND

Randall Bissinger went to New Country Buffet Restaurant on or about May 8, 2006. He ordered an "All You Can Eat" buffet meal and selected and consumed three raw oysters from the buffet table. Soon after consuming the oysters, Mr. Bissinger began to experience severe symptoms and illness. His brother took him to the Veterans Administration Hospital, where he was diagnosed with *vibrio vulnificus septicemia,* a serious blood infection. *Vibrio vulnificus* is a naturally-occurring bacteria that is found in shellfish that absorb it from their environment.

On September 18, 2006, Mr. Bissinger filed a Complaint in the Circuit Court of Davidson County, naming New Country Buffet and its owner, Shao Chai Chen, as defendants (hereinafter "New Country Buffet" or "the restaurant"). He alleged that the oysters he consumed were contaminated and that they caused his injuries. He asserted a number of causes of action.

It is undisputed that the oysters Mr. Bissinger ate contained *vibrio vulnificus*, although there was no proof regarding the level of the bacteria in the oysters. It is also undisputed that the bacteria caused Mr. Bissinger to become very ill.

New Country Buffet filed an answer denying that it was guilty of negligence or of any acts or omissions that caused or contributed to Mr. Bissinger's injuries. It also raised the affirmative defense of comparative fault, stating that in the event the proof showed that it was negligent to some degree, its liability had to be reduced by the fault of the companies that supplied the oysters consumed by Mr. Bissinger.

Three suppliers were specifically named as possible third party defendants: Gulf Pride Seafood of Franklin, Tennessee; Leavins Seafood, Inc., of Apalachicola, Florida; and Bon Secour Fisheries, Inc., of Bon Secour, Alabama (collectively, "Suppliers"). Defendant Gulf Pride sold and delivered the oysters in question to New Country Buffet after obtaining them from "processor/wholesalers" Bon Secour and Leavins. It is unclear which of the two wholesalers was the source of the oysters Randall Bissinger consumed.

Randall Bissinger remained in the VA hospital for 143 days and died there on October 20, 2006. Mr. Bissinger's treating physician testified that the *vibrio* infection had become inactive as of July 2006, and that a staph infection had then set it.

His nephew, Aaron Bissinger ("Bissinger"), was named as his executor, and after filing a suggestion of death in the trial court, he was substituted as plaintiff in the case. Bissinger filed an amended complaint on February 22, 2007, in which he named as additional defendants those parties named in the restaurant's answer. Bissinger asserted that his uncle's death was the result of "*vibrio vulnificus* primary septicemia caused by his ingestion of oysters." Bissinger also stated that his uncle suffered from hepatitis C and cirrhosis of the liver, was unaware of the dangers of severe injury or death associated with consuming raw oysters, and was unaware that people with liver disease or weakened immune systems were at increased risk of those dangers.[1]

The three suppliers all filed answers to the amended complaint in which they denied any liability and asked the court to dismiss all the claims against them. The defendants also asserted that under the principles of comparative fault, Randall Bissinger was more than 50% liable for his own injuries, because he knew or should have known that eating raw oysters could cause serious health risks and even death for individuals suffering from his medical conditions.

After taking the depositions Shao Chai Chen, owner of New Country Buffet, and of his wife and brother-in-law, who were both employees of the restaurant, Bissinger filed a second amended complaint. Among other things, he added allegations that almost from its 2005 opening, New Country Buffet was repeatedly cited by the Metro Nashville Public Health Department for violations related to health and safety. Those violations included many identified as "critical" and which involved keeping food (including seafood) at improper temperatures "during storage, preparation, display, service, and transportation." Bissinger also added a claim for punitive damages against New County Buffet and its owners.

Further discovery followed, and Bissinger filed a third amended complaint. After the expiration of deadlines established in case management orders, the defendants attempted to amend their previously-filed answers to name additional parties as partially responsible for Randall Bissinger's injuries under the principles of comparative fault. Their allegations included companies involved in the harvesting and transportation of the oysters that were sold to New Country Buffet and doctors at the VA hospital who had

---

[1] Plaintiff's amended complaint alleged that his uncle was not diagnosed with cirrhosis of the liver until after he was admitted to the Veterans Administration Hospital. A later amendment alleged that his hepatits C had been cured.

–3–

treated Randall Bissinger. Bissinger filed motions to strike the amendments, which the trial court granted.

The causes of action alleged in the final complaint that are relevant to this appeal included common law negligence, negligence per se, failure to warn, and breach of the implied warranty that the food Suppliers provided and the restaurant served was reasonably fit for human consumption. The trial court dismissed Bissinger's claim based upon the Tennessee Consumer Protection Act, but that dismissal was not appealed.

## II. SUMMARY JUDGMENT PROCEEDINGS

Bissinger filed a motion for partial summary judgment, asking the court to find, "as a matter of undisputed fact and law" that the oysters eaten by Randall Bissinger were "defective and unreasonably dangerous," and that they were "adulterated" in accordance with the definition found at Tenn. Code Ann. § 53-1-104 of the Tennessee Food, Drug and Cosmetic Act. In the same month, the defendants all filed their own motions for summary judgment on all issues. New Buffet's motion asserted that there was no specific evidence that the restaurant improperly handled the raw oysters that Randall Bissinger ate. For their part, Suppliers argued there was no breach of duty and that, as a matter of law, Bissinhger could not establish necessary elements of the claims he had brought.

The trial court denied Bissinger's motion for partial summary judgment. The court noted that no Tennessee Court has addressed the question of what constitutes "adulterated food," under Tenn. Code Ann. § 53-1-104, but in reliance on persuasive authority, it held that oysters containing *vibrio vulnificus* were not adulterated as a matter of law. It also held that such oysters were not defective or unreasonably dangerous.

The trial court granted Suppliers summary judgment on every issue and every theory of recovery that was raised against them, except for the adequacy of their warnings about the dangers of ingesting their products. The court allowed all of Bissinger's remaining claims against the restaurant to stand.

All the parties moved the trial court for permission to file applications for interlocutory appeal of the trial court's summary judgment order. The trial court granted the motions, and this court granted all four applications and consolidated them for appeal.

### III. STANDARD OF REVIEW

The standards for decision on a motion for summary judgment are well-known. The trial court may only grant such a motion if the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). "If there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." *Byrd v. Hall*, 847 S.W.2d at 211.

To be entitled to summary judgment, a defendant moving party must either (1) affirmatively negate an essential element of the non-moving party's claim or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1, 9 (Tenn. 2008). If the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of a genuine issue of material fact. *Martin v. Norfolk Southern Railway*, 271 S.W.3d at 84; *Hannan v. Alltel*, 270 S.W.3d at 5; *Staples v. CBL & Associates*, 15 S.W.3d 83, 86 (Tenn. 2000) (citing *Byrd v. Hall*, 847 S.W.2d at 215)).

When considering a summary judgment motion, the trial court must view the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in the non-moving party's favor, and discard all countervailing evidence. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d at 210–11. Accordingly, the court is not to "weigh"the evidence when evaluating a motion for summary judgment, or substitute its judgment for that of the trier of fact. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d at 87; *Byrd v. Hall*, 847 S.W.2d at 211.

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk Southern Railway Co.*, 271 S.W.3d at 84; *Blair v. West Town Mall*, 130 S.W.3d at 763. We review the summary judgment decision as a question of law. *Id.* Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair v. West Town Mall*, 130 S.W.3d at 763.

In our review, we must also consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all the reasonable inferences to be drawn from that evidence. *Green v. Green,* 293 S.W.3d 493, 514 (Tenn. 2009); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249

S.W.3d 301, 307 (Tenn. 2008); *Memphis Housing Authority v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

## IV. EVIDENCE REGARDING VIBRIO VULNIFICUS

The parties presented a tremendous amount of evidence in support of their respective summary judgment motions, including twenty-two separate depositions. The deponents included principals and employees of the defendant restaurant and the defendant suppliers; experts in the harvesting and processing of shellfish; a restaurant inspector from the Metro Public Health Department; a pathologist, a microbiologist and several medical doctors.

The undisputed expert testimony was that *vibrio vulnificus* is a naturally occurring, salt-loving bacteria found mainly in warmer marine environments all over the world. Some level of *vibrio* is present in almost all oysters. The bacteria has no taste and no odor, and it cannot be detected by any method that does not also require killing the oyster.

There was also undisputed testimony that *vibrio vulnificus* can be lethal when large enough quantities are ingested. James Oliver, Ph.D., a microbiologist who has studied and written about marine bacteria for over forty years, testified that 300 organisms per gram of oyster is sometimes cited as the threshold between safe and unsafe concentrations of *vibrio*, but that he himself was unsure of the actual reliability of that figure. He testified, however, that concentrations of *vibrio* can vary from undetectable to over 100,000 organisms per gram of oyster. There was no evidence regarding the concentration of the bacteria in the oysters consumed by Mr. Bissinger or those on the buffet.

Dr. Oliver also testified that *vibrio vulnificus* has the highest fatality rate of any food-borne pathogen and estimated that over 95% of the deaths relating to seafood arise from *vibrio* infections, and that of those, over 90% are associated with the consumption of raw oysters from the Gulf of Mexico. However, the proof also showed that the absolute numbers are relatively small, **with less than a hundred deaths a year from all food-poisoning related illnesses**. Dr. Oliver acknowledged that the vast majority of those who become infected with *vibrio* also suffer from predisposing conditions such as liver disease and diabetes.

In fact, the presence of *vibrio vulnificus* in oysters is not seriously harmful to the general public. While otherwise healthy individuals may suffer temporary gastrointestinal illness, they do not contract the serious blood infection involved in this

case.  The only danger of serious illness from the bacteria is to those individuals with immune disorders, liver conditions, or stomach disorders.

A certified food safety professional testified that *vibrio vulnificus* proliferates in warm water, which is the reason for the widespread recognition that it can be dangerous to eat raw oysters in the summer.  That recognition has led to a rule of thumb that one should not consume raw oysters in months without an "r" in their names (the months May through August).  Because *vibrio* can continue to multiply in raw oysters after they are harvested, federal and state regulations govern the manner in which such oysters are handled, in order to prevent such proliferation by always keeping them at a temperature below 45 degrees Fahrenheit and preferably between 37 degrees and 40 degrees.

### IV. NEGLIGENCE CLAIM AGAINST THE SUPPLIERS

The elements of a cause of action for common-law negligence are duty, breach of duty, cause in fact, loss or injury and proximate cause.  *McCarley v. West Quality Food Service*, 948 S.W.2d 477, 479 (Tenn. 1997) (citing *Haynes v. Hamilton*, 883 S.W.2d 606, 611 (Tenn. 1994)); *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn. 1991).  Suppliers asked the trial court to grant them summary judgment on Bissinger's negligence claim and presented evidence to negate an essential element of negligence, breach of the duty of care.

### A.  Evidence and Burden Shifting

Suppliers acknowledge that, like all vendors of food, they have a duty to exercise the highest degree of care in their handling of food intended for consumption by the public.  *See* Tenn. Code Ann. § 53-1-194; *Jones v. Mercer Pie Co.*, 214 S.W.2d 46, 49 (Tenn. 1948).  The proof and relevant regulations indicate that the required degree of care in the case of raw oysters includes continuously keeping them at a safe temperature of forty-five degrees Fahrenheit or below while receiving, storing, processing or transporting them, in order to reduce the potential danger posed by the proliferation of *vibrio vulnificus* and other harmful microorganisms.

Bon Secour, Leavins, and Gulf Pride all presented testimony and documentary evidence as to the manner in which they handled the oysters they sold.  For example, Chris Nelson, the vice-president of oyster operations at Bon Secour Fisheries testified that his company does not harvest the oysters it sells, but only buys them from certified dealers, who are required to adhere to a time limit on how long an oyster can be out of the water before it is refrigerated.  Bon Secour also follows a "Hazard Analysis and Critical Control Point Program" (HAACP) that governs the safe receiving and storing of oysters before it ships them out for delivery.  When the oysters arrive from the dealer, its

employees check the temperature in the interior of the trucks delivering them, as well as the dealer's tags to make sure the oysters are from an approved water source. The oysters are then moved to a cooler for storage.

The oysters are subsequently washed to remove mud, sorted on a conveyor by appearance and size and then placed in boxes or burlap sacks depending on their size and anticipated use. The washing and sorting process takes ten to fifteen minutes. The oysters are then sent back into the cooler or into a refrigerated truck for delivery. Each burlap sack is sealed, with a USDA-required tag attached that contains safe handling guidelines and a warning about the risks associated with the consumption of raw oysters. Mr. Nelson testified that Bon Secour complies with every state and federal regulation that is applicable to the sale and distribution of oysters.

Grady Leavins, owner of Leavins Seafood, testified that his company likewise follows an HAACP plan. He testified that he purchases oysters from Prestige Oyster Company, which is a certified establishment regulated by the State of Texas, as well as from fishermen in Apalachicola Bay. He further testified that the oysters sold by Leavins to Gulf Pride Seafood of Franklin, and then in turn to New Country Buffet, were purchased by Leavins from Prestige. His testimony about Leavins' handling of oysters after they are purchased from Prestige was similar to Mr. Nelson's testimony about the practices of Bon Secour, including regular monitoring and recording of temperatures in trucks and coolers to ensure proper temperature control.

Each bag of oysters shipped by Leavins is also tagged, in order to provide traceability of the product back to its source. Like the tags used by Bon Secour, Leavins' tags state on their face that, "THIS TAG IS REQUIRED TO BE ATTACHED UNTIL CONTAINER IS EMPTY AND THEREAFTER KEPT ON FILE FOR 90 DAYS." The same tags also provide information about the risks of consuming raw oysters under the heading, "RETAILERS INFORM YOUR CUSTOMERS."

James Johnson, owner of Gulf Pride Seafood, testified that his company measures the temperature in three critical areas when sealed bags of oysters arrive at his business from Bon Secour or Leavins. The first temperature reading is taken immediately at the time of arrival. Readings are also taken in the refrigeration units for the storage of seafood between the time of receipt and the time of delivery. Finally, Gulf Pride measures the temperature at the time of delivery to the customer's facility. Temperature logs for April and May of 2006, submitted as exhibits to Mr. Johnson's deposition, do not list any temperatures above 37 degrees Fahrenheit in the company freezer or cooler. Gulf Pride does not open the sealed bags at any time when they are in its possession.

Thus, Suppliers presented evidence as to the standard of care applicable to their handling of oysters for sale and also evidence that they did not breach that applicable standard of care. Accordingly, the burden shifted to Mr. Bissinger to present countervailing proof that would present a dispute of fact.

Bissinger did not offer any proof that Suppliers failed to follow the procedures they described, nor did he offer any other evidence of improper handling of the oysters by Suppliers. He did not present any evidence of any negligent handling of the oysters from the time Suppliers received them until they were delivered to New Country Buffet.

## B. Duty or Standard of Care

Instead of presenting evidence to dispute Suppliers' testimony regarding their handling of the oysters and their compliance with relevant law and regulation governing the handling of oysters for sale, Bissinger argues for a different duty or standard of care. Essentially, he argues that Suppliers had a duty **not** to deliver these raw, live oysters, regardless of compliance with all existing safety and handling requirements.

Relying on testimony of his expert, Bissinger asserts that selling raw oysters from the Gulf of Mexico in the summer months should be considered an *ipso facto* violation of the duty of care. In other words, he asserts that there is no standard of care for selling such live oysters, because they should not be sold for consumption at all. One expert testified that "An oyster supplier using reasonable and ordinary care would only sell summer month Gulf oysters that have been post-harvest processed, and that are, therefore, free of deadly *vibrio* bacteria and safe." The expert acknowledged under cross-examination, however, that post-harvest processing kills the oyster. Thus, his version of a duty of care does not apply to the sale of **live** raw oysters.

Bissinger presented deposition testimony of his expert witnesses, Clifford Hillman and Pat Fahey, both long-time veterans of the seafood business, who testified about several technologies that collectively go by the name of "post-harvest processing," and which have been in use since the 1990's. According to their testimony, post-harvest processing can reduce *vibrio* in oysters to non-detectable levels and make them safe (or safer) to consume. They testified that post-harvest processing is inexpensive and that it does not change the

–9–

appearance, texture or taste of the oyster.[2]   However, Suppliers note that there is an appreciable difference between eating a live raw oyster and one that is dead.

The standard espoused by Bissinger's experts would preclude the sale of live, raw oysters harvested from the Gulf in warm weather.  The experts' testimony does not address a standard, or duty of care, applicable to the handling and processing of **live** oysters harvested during the summer in the Gulf.  It does not dispute Suppliers' evidence regarding the relevant standard of care and their compliance with that standard.  The standard proposed by Mr. Bissinger and his "experts" does not address additional precautions for handling or processing live Gulf oysters.  Instead, they assert that Suppliers have a duty not to process or sell such oysters at all.

Bissinger argues that because Suppliers did not offer any evidence to contradict his expert's testimony, the trial court should have denied Suppliers' motion for summary judgment, in accordance with the rule that all the factual evidence presented at the summary judgment phase must be considered in the light most favorable to the non-moving party.  *Doe v. HCA Health Services, Inc.*, 46 S.W.3d at 196; *Memphis Housing Authority v. Thompson*, 38 S.W.3d at 507.

The expert's opinion as to the appropriate standard of care is not, however, evidence of facts.  The question of the applicable standard of care does not involve a factual issue to which the burden-shifting analysis applies.  Instead, duty of care is a question of law.  Whether the defendant owes the plaintiff a duty of care is a question of law.  *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn.1993).  Negligence is basically defined as the failure to exercise reasonable care, and a plaintiff must establish that a duty of care was owed by defendant to plaintiff and that the defendant's conduct fell below that applicable standard of care that amounts to a breach of that duty.  *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 364 (Tenn.2009).

Duty is a legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm.  *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn.2008) (citing *Burroughs v. Magee*, 118 S.W.3d 323, 328–29 (Tenn.2003).  In any negligence case, the question is whether the particular defendant owes a particular duty of care to the particular plaintiff.  *West v. E.*

---

[2] Mr. Fahey is a founder of Ameripure Processing, a company that developed post-harvest processing technology using hot water and which sells processed oysters.  He holds a patent on the process.  Mr. Hillman is a member of a family that has been in the seafood business for several generations.  He owns and operates a shrimp and oyster company that uses cryogenic freezing for post-harvest processing of oysters.  The defendant suppliers argue that the testimony of these witnesses is suspect, because their post-harvest processed oysters are in direct competition with the suppliers' unprocessed oysters.

*Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn.2005). Whether a defendant owes a duty of care to a plaintiff is a question of law to be determined by the court. *West v. E. Tennessee Pioneer Oil Co.*, 172 S.W.3d at 550; *Coln v. City of Savannah,* 966 S.W.2d 34, 39 (Tenn.1998); *see Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn.2008) ("In the end, whether a defendant owed . . . a duty of care to a plaintiff is a question of law for the court to decide.").

There is no dispute that Suppliers owe a duty of reasonable care, even heightened care, to the public who consume the oysters they provide. However, Bissinger would have this court apply to Suppliers a duty to cease supplying or selling a certain product, not to impose a duty to handle the product in a way that is different from the methods described by Suppliers. We decline to do so, especially in the absence of authority for the proposition that Suppliers must process the oysters in question in a method that kills them. Adoption of the duty of care espoused by Mr. Bissinger would effectively exclude from the stream of commerce a product that has never been illegal in Tennessee. We decline to adopt such a duty.

In the absence of any evidence that Suppliers violated their duty of care in the manner that they handled the oysters they sold, we affirm the trial's dismissal on summary judgment of Bissinger's claim of negligence against them.

## V. PRODUCT LIABILITY CLAIMS AGAINST SUPPLIERS

Bissinger's amended complaint included product liability claims against Suppliers, which the trial court dismissed on summary judgment. Under the Tennessee Products Liability Act, Tenn. Code Ann. § 29-28-101 *et seq.*, a manufacturer or seller may be held liable for injuries resulting from the use of a product if the product is found to have been defective or unreasonably dangerous when it left the control of the manufacturer or seller. Tenn. Code Ann. § 29-28-102(6).

### A.  Immunity for Products in Sealed Containers

The seller of a product produced or manufactured by another may be shielded from a product liability claim, however, by the "sealed container doctrine," which is established at Tenn. Code Ann. § 29-28-106. The version of that statute in effect at the time of Randall Bissinger's injury reads in relevant part as follows:

> No "product liability action" as defined in § 29-28-102(6), shall be commenced or maintained against any seller when the product is acquired and sold by the seller in a sealed container **and/or** when the product is acquired by the seller under circumstances in which the seller is afforded no

reasonable opportunity to inspect the product in such a manner which would or should, in the exercise of reasonable care, reveal the existence of the defective condition. . . .

Tenn. Code Ann. § 29-28-106(a) (1983).[3]

In other words, if the seller of a defective or unreasonably dangerous product receives and sells it in a sealed container and/or is not in a position to discover its dangerous condition, the Act protects the seller from liability under most circumstances, and instead places liability solely upon the manufacturer. *See Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 901 (Tenn. 2011) (dealer not liable because he had no reasonable opportunity to inspect defective brake system on truck); *Ford v. Roddy Mfg. Co.*, 448 S.W.2d 433, 436 (Tenn. Ct. App. 1969) (bottler liable for insect in bottle of Coca-Cola).

In the case before us, the trial court declared that it was adopting the sealed container doctrine, "as far as Bon Secour, Leavins and Gulf Pride are concerned." The court reasoned that the doctrine applied to Suppliers because they acquired the oysters they sold in a sealed condition and did not have a way to inspect each oyster without destroying it. Suppliers had argued, and argue on appeal, that each oyster is, itself, in a sealed container. The trial court also found that Suppliers could not be considered the "manufacturers" of the oysters, and thus that they were entitled to the immunity that the sealed container doctrine accords to non-manufacturer sellers. *See* Tenn. Code Ann. § 29-28-106(b).

We conclude that Suppliers are not entitled to the immunity granted by the sealed container doctrine in Tenn. Code Ann. § 29-28-106. First, Suppliers are, according to applicable statutory definitions, "manufacturers." Second, we do not believe that a living oyster's shell is a "sealed container" as contemplated by the doctrine.

Since oysters are a natural product, it may seem counterintuitive to consider Suppliers to be their "manufacturers." Nonetheless, contrary to the holding of the trial

---

[3] The current version of Tenn. Code Ann. § 29-28-106 (2011), reads in relevant part,

(a) No product liability action, as defined in § 29-28-102, shall be commenced or maintained against any seller, other than the manufacturer, unless:
(1) The seller exercised substantial control over that aspect of the design, testing, manufacture, packaging or labeling of the product that caused the alleged harm for which recovery of damages is sought;
(2) Altered or modified the product, and the alteration or modification was a substantial factor in causing the harm for which recovery of damages is sought; . . .

–12–

court, the suppliers do meet the definition of "manufacturers" under the Product Liability Act. Tennessee Code Annotated § 29-28-102(4) defines a "manufacturer" as "the designer, fabricator, producer, compounder, processor or assembler of any product or its component parts." Bon Secour and Leavins both refer to themselves as processors, and even if their processing only consists of washing, refrigerating and packing the oysters, they must be considered manufacturers under the statute. Further, Title 21 of the Code of Federal Regulations which governs food and drugs includes "handling" and "storing" of fish or fishery products in its definition of "processing." 21 CFR 123.3(k) and (l). Under that definition, therefore, Gulf Pride is also a processor, and is likewise not entitled to the benefits of the sealed container rule.[4]

The evidence shows that improper handling of live oysters can cause proliferation of *vibrio* or other dangerous microorganisms. Thus, any suppliers who negligently process or store live oysters are in a position to cause a dangerous condition or to render an otherwise safe product unreasonably dangerous. Accordingly, the immunity from liability through the sealed container doctrine is not applicable to such suppliers, because the purpose of Tenn. Code Ann. § 29-28-106 is not to shield from liability those in a position to discover, prevent or cure a dangerous condition.

Additionally, we cannot find that oysters qualify as a sealed container. The sealed container immunity is based on the idea of a product made by one entity, sealed by that entity before it is transferred to a buyer, such as a store, and remaining sealed while in the store. The seal is eventually broken by the ultimate buyer. A live oyster does not fit this concept.

Oysters are not manufactured through human agency. They are not placed in their containers (shells) and sealed in there by any person or company. Rather, oysters are natural products, growing in the sea in shells. The shell is part and parcel of their existence. Oysters are not sealed, for as filter feeders they must open their shells in their natural environment to take in the sea water that contains the nutrients that sustain their lives. In so doing, they also take in the microorganisms contained in that water.

Because live oysters are not sealed, it is possible that they may be handled or processed in such a way that parties along the supply chain can cause them to become unreasonably dangerous. The fact that the federal government imposes strict requirements

---

[4] Gulf Pride disputes that the oysters themselves are sealed containers, but contends that the burlap sacks of oysters they receive from Bon Secour and Leavin should be considered sealed containers for the purposes of the doctrine. But since improper handling of these sacks can cause *vibrio* to proliferate in the oysters contained therein, it would be equally inappropriate for them to enjoy the benefits of the sealed container doctrine.

for handling live raw oysters is indicative of that potential. We conclude that Suppliers are not entitled to immunity under the sealed container doctrine.

## B. Unreasonably Dangerous Product

As set out above, a seller may be liable under our Products Liability statutes for injuries that result from a product that is in a defective condition or is unreasonably dangerous. In Tennessee, a defective condition is "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. §29-28-102(2).

In the case before us, although Suppliers are not entitled to sealed container immunity, they are entitled to the presumption found at Tenn. Code Ann. § 29-28-104(a), which provides:

> Compliance by a manufacturer or seller with any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design, inspection, testing, manufacture, labeling, warning or instructions for use of a product, shall raise a rebuttable presumption that the product is not in an unreasonably dangerous condition in regard to matters covered by these standards.

Tenn. Code Ann. § 29-28-104(a).

The record contains ample proof of compliance by all three suppliers with statutes and regulations governing the commercial handling of fresh seafood, including very specific regulations about maintaining proper temperatures at all times. As discussed more fully below, the proof also shows Supplier complied with regulations regarding notice or warning of potential dangers with the oysters. Bissinger has not offered any proof that Suppliers did not adhere to applicable regulation and does not actually dispute their compliance. Thus, he has failed to raise a material question of fact as to whether the statutory presumption applies. The presumption that the oysters were not unreasonably dangerous applied.

However, Bissinger argues that, despite the presumption, the oysters were in fact in an unreasonably dangerous condition because, pursuant to Tennessee Code Annotated 53-1-104(C), Tennessee's Food, Drug, and Cosmetic Act, food must be free from contamination and must not be adulterated.

One of Bissinger's experts testified that he considered the presence of *vibrio* to be a contamination of oysters. The opinion of the witness on the meaning of the word

–14–

"contaminated," as used in a statute or regulation, is not, however, factual evidence. Since the question is answered by interpretation of a statute and application of a statutory standard to a particular set of facts, it is a question of law, not of fact. *U.S. Bank v. Tennessee Farmers Mut. Ins. Co.*, 227 S.W.3d 381, 386 (Tenn. 2009) (citing *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 175 (Tenn. 2008)).

The proof showed that *vibrio* is naturally occurring and that some level of *vibrio* can be found in almost all oysters. The proof also showed that vibrio is not dangerous to most people. Courts in other states have considered the question of whether oysters containing vibrio can be considered "contaminated" and/or whether they are "unreasonably dangerous."

In *Woeste v. Washington Platform Saloon & Restaurant*, 836 N.E.2d 52 (Ohio Ct. App. 2005), the court found that oysters containing *vibrio* are not "adulterated" and explained:

> Vibrio is not an added substance. It is a naturally occurring bacteria that is taken in as the oysters filter feed. Because it is naturally occurring, vibrio cannot adulterate oysters unless the amount of vibrio present in a particular oyster would ordinarily render it injurious to health. . . . Vibrio has a minimal effect on the general population. At most, it can cause indigestion or diarrhea; it is not commonly injurious to health. Vibrio is only deadly to those with weakened immune systems or stomach disorders. . . . Because the bacteria does not affect the great majority of those who eat raw oysters, we conclude that the oysters in this case were not adulterated.

836 N.E.2d at 76-77.

In other cases, courts have held that oysters containing the naturally-occurring bacteria *vibrio vulnificus* are not defective or in a defective condition. *See, e.g., Edwards v. Hop Sin, Inc.*, 140 S.W.3d 13, 16 (Ky. Ct. App. 2003) ( holding that presence of *vibrio* did not make oysters defective because the bacteria occurs naturally under commonly occurring conditions, screening is not feasible without destroying the oyster, and the bacteria poses little threat of harm to healthy persons). Another court explained its holding this way:

> Vibrio vulnificus bacteria in raw oysters poses little, if any, threat to a healthy person. The bacteria is only harmful to those persons with specific underlying disorders such as liver or kidney disease. Seen in this light, the 'defect' is really found in the person rather than the product, much in the same way that sugar is only harmful when used by someone with diabetes.

*Simeon v. Doe*, 618 So2d 848, 851 (La. 1993).

More recently, another court analyzed previous holdings and concluded that a defendant was entitled to summary judgment on this question because there was no genuine issue of material fact as to "whether an oyster with vibrio is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it." *Bergeron v. Pacific Food, Inc.*, WL 1017872, *4-5 (Conn. Super. 2011). That court, like others, based its holding that oysters containing *vibrio* were not unreasonably dangerous on the evidence that such oysters pose very little threat to healthy individuals. It also noted the Restatement observation that many products cannot be made absolutely safe for consumption by all people.

We agree with the reasoning of these holdings and hold that summary judgment was appropriate on this issue. We accordingly affirm the trial court's grant of summary judgment to Bon Secour, Leavins and Gulf Pride, on Bissinger's product liability claims.

## VI. IMPLIED WARRANTY AND WARNING

Bissinger next alleged that Suppliers breached an implied warranty that the oysters were merchantable. Tennessee Code Annotated § 47-2-314, part of the Sales Chapter of the Uniform Commercial Code, states that a contract of sale between a merchant and a customer implies a warranty that the goods sold are "merchantable." To be merchantable, goods must, among other things, be "fit for the ordinary purposes for which such goods are used." Tenn. Code Ann. § 47-2-314(2)(c). That statute specifically includes the sale of food and drink for consumption either on the premises or elsewhere as subject to the implied warranty. To be "fit for ordinary purposes" and thus merchantable, food must be safe to eat.

Because a product is "defective" if it is in a condition that renders it unsafe for normal or anticipated handling and consumption, under the Products Liability Act, Tenn. Code Ann. §29-28-102(2), and a "merchantable" product must be fit for ordinary purposes, there may be very little factual difference between a product that is "defective" under the Tennessee and a product that is not merchantable under Tenn. Code Ann. § 47-2-314. *See Irion v. Sun Lighting, Inc.*, M2002-00766-COA-R3-CV, 2004 WL 746823 (Tenn. Ct. App. Apr. 7, 2004) (no Tenn. R. App. P. 11 application filed).

Unlike product liability claims, however, warranty claims sound in contract rather than in tort, meaning that different elements must be proved to establish such claims and different defenses may be advanced to defeat them. *See Holt v. Stihl*, 449 F.Supp. 693, 694 (E.D. Tenn 1977). One significant difference between claims for breach of implied warranty and other claims that fall under the rubric of product liability is that to prevail on

–16–

a warranty theory, it is not necessary to show negligence, but only breach of the implied warranty that the product is wholesome and fit for human consumption. *See Manzoni v. Detroit Coca-Cola Bottling Co.*, 109 N.W.2d 918, 921 (Mich. 1961).

There are no Tennessee cases that specify the standards a court should apply to determine whether food is merchantable under Tenn. Code Ann. § 47-2-314. However, one undisputed principle is that regardless of the type of product involved, to recover for breach of an implied warranty, the plaintiff must establish that the alleged defect or unfitness was present when the product left the defendant's control. Tenn. Code Ann. § 29-28-105(a); *Leach v. Wiles,* 429 S.W.2d 823, 832 (Tenn. Ct. App. 1968); *Meigs Farmers Co-op. v. Calfee*, C.A.90, 1987 WL 5344 at *2 (Tenn. Ct. App. Jan. 16, 1987).

Suppliers argue that, as a matter of law, the presence of *vibrio vulnificus* could not be deemed a breach of the warranty that their oysters were wholesome and fit for human consumption, because the microorganism is natural to shellfish and is found in almost all oysters. Bissinger offered no proof of the concentration of *vibrio* in the oysters consumed by his uncle or the concentration when the oysters left the control of Suppliers. Thus, Bissinger would have us hold that any amount of the bacteria would make an oyster unmerchantable.

As Suppliers have explained, although Tennessee has not established a standard for analyzing the merchantability of food, other states have adopted the "foreign natural test" or the "reasonable expectation test." Under the foreign natural test, food is unfit for the purpose for which it is sold if an object found in the food does not naturally occur in that food. *Webster v. Bue Ship Tea Room*, 198 N.E.2d 309 (Mass. 1964). Under the reasonable expectation test, "liability will lie for injuries caused by a substance where the consumer of the product would not reasonably have expected to find the substance in the product." *Jackson v. Nestle-Beich, Inc*., 589 N.E.2d 547, 548 (Ill. 1992).

Factors relevant to the reasonable expectation analysis, *i.e.,* what a consumer might reasonably expect, include the "naturalness" of the substance causing the injury and the amount of processing the food may have gone through since its harvesting and its sale. As one court explained, "A consumer, by seeking to eat clams raw, wishes the clams to be such. Thus a consumer should expect substances that are indigenous to the organism in its natural state to be present when he or she receives it." *Clime v. Dewey Beach Enterprises, Inc*., 83 F. Supp. 341 (D. Del. 1993).

Because *vibrio vulnificus* is naturally occurring, appears in most shellfish and almost all oysters to some degree, and can reasonably be expected to be found in live raw oysters, the oysters supplied herein were merchantable under both tests. We find the tests

used in other states to be a reasonable way to analyze the issue of merchantability of food products.

Since the consumption of raw summer oysters can be dangerous to consumers who suffer from certain medical conditions, it follows that the sale of such oysters without adequate warning of the dangers of ingesting them could indeed render them unmerchantable and make their sale a breach of the implied warranty. Suppliers acknowledge that they have a duty to warn such individuals of the danger of consuming raw oysters.

Suppliers contend, however, that, even if there were a question of merchantability as to certain individuals, they have rendered their product merchantable by furnishing specific warnings directed towards people whose medical condition places them at risk. They also insist that they had no reason to believe that such individuals would be so foolish as to ignore those warnings. *See Woeste v. Washington Platform Saloon & Restaurant*, 836 N.E.2d 52 (where proper warning is given, the seller may reasonably assume that it will be read and heeded).

The proof in this case showed that in accordance with Federal Regulations, both Bon Secour and Leavins fastened harvesting tags to each bag of oysters they sold. The information on the tags included the harvest date, the State where the oysters were harvested, and the instruction that the product should not be consumed raw after 14 days from the date of harvest, but should be thoroughly cooked.

Bon Secour's tags contained the following warning: Consumer Information: THERE IS A RISK ASSOCIATED WITH CONSUMING RAW OYSTERS OR ANY RAW ANIMAL PROTEIN. IF YOU HAVE CHRONIC ILLNESS OF THE LIVER, STOMACH OR BLOOD OR HAVE IMMUNE DISORDERS, YOU ARE AT GREATER RISK OF SERIOUS ILLNESS FROM RAW OYSTERS. YOU MAY, HOWEVER, EAT YOUR OYSTERS FULLY COOKED. IF UNSURE OF YOUR RISK YOU SHOULD CONSULT YOUR PHYSICIAN. PLEASE SHARE THIS INFORMATION WITH YOUR CUSTOMERS.

Leavins' tags contained a similar (although not identical) warning. The proof showed that Gulf Pride did not remove the warnings from the bags of oysters it received from Bon Secour and Leavins, but sold the oysters to the restaurant with the tags intact. These warnings were adequate to put a susceptible individual on notice and to put a restaurant on notice that it should pass the warning on to customers. "When the adequacy of such a warning is to be judged, whether under strict liability, negligence or breach of warranty, the standard of reasonable care is to be applied.*" Whitehead v. Dycho Co., Inc.*, 775 S.W.2d 593, 596 (Tenn. 1989).

Bissinger argued that the notice was not sufficient because it did not mention death as a potential risk. It is not entirely clear if Bissinger's failure to warn claim was brought as a separate, negligence-based claim or whether it was part of its lack of merchantability argument. Despite Bissinger's insistence, we hold that the warnings provided by Supplers were sufficient to meet the reasonable care standard and to satisfy the implied warranty of merchantability. Additionally, because Suppliers had no ability to directly warn customers of restaurants that bought oysters from them, they cannot be held to have breached a duty to warn the eventual consumer of its products.

Accordingly, we reverse the trial court as to this issue, and grant summary judgment to Suppliers on the claims of breach of implied warranty of merchantability and, to the extent it is a separate cause of action, on the claim of failure to adequately warn.

## V. THE NEGLIGENCE CLAIMS AGAINST THE DEFENDANT RESTAURANT

Bissinger brought the same or similar claims against the restaurant. The trial court denied New Country's motion for summary judgment. New Country Buffet argues that the trial court should have granted it summary judgment on all issues.

For his part, Bissinger argues that the trial court's denial of summary judgment in favor of New Country should be affirmed, presumably as to all causes of action. However, the only argument made by Bissinger in his brief relates solely to the negligence claim. Thus, the basis for his argument on appeal as to the other causes of action is not explicit.

## A. Negligence

Our courts have long acknowledged the importance of food safety. *See Jones v. Mercer Pie Co.*, 214 S.W.2d 46, 49 (Tenn. 1948) (". . . it is very important that producers of food products intended for consumption by the public should be held to the highest degree of care in the production of that product and in the placing of it upon the market."). *See, also*, *State ex rel. Nashville Pure Milk Co. v. Town of Shelbyville,* 240 S.W.2d 239, 243 (Tenn. 1951); *Boyd v. Coca-Cola Bottling Works*, 177 S.W. 80, 81 (Tenn. 1914); *American Chariot v. City of Memphis*, 164 S.W.3d 600, 604 (Tenn. Ct. App. 2004).

There is no dispute that the restaurant had a duty to use reasonable care in handling, preparing, storing, and serving the food it sold. In the context of the sale of food products to the public, reasonableness may be measured by a duty to use the greatest care to insure the safety of those products. As to the common law negligence claim, the restaurant contends that Bissinger submitted no proof that it breached its duty of care in the way it handled the oysters that it served.

However, in the summary judgment stage, it was incumbent upon the movant, New Country Buffet, to first provide evidence that its employees did use reasonable care in the handline of the oysters. The only actual evidence presented by the restaurant on that issue was summarized by the restaurant in its brief. Essentially, raw oysters are placed on the buffet after 4:00 p.m.; prior to being put on the buffet, raw oysters are stored in a walk-in refrigerator; there has never been a finding by an inspection official that the temperature in the walk-in was improper; and that the refrigerator underwent regular inspections by a refrigeration company to insure it performed at the correct temperature.

Additionally, the restaurant provided testimony of a Metro Health Department official that New Country Buffet has had no issues related to raw oysters; that the restaurant had properly maintained the labels from oyster suppliers; that there had been no other complaints of food borne illnesses from food served at the restaurant; specifically there had been no other complaints of illness caused by raw oysters at the restaurant; and, finally, that the restaurant had never been cited for any violations regarding the storage, handling, and display of raw oysters. It even goes so far as to assert that "[t]he fact is that when raw oysters are involved, New Country Buffet had a spotless record and Plaintiff submitted no proof to the contrary."

Bissinger provided evidence of the restaurant's failure to comply with Metro Health Department's regulations regarding the safe handling of foods, even though the food involved was not raw oysters. We are not persuaded that proof should be limited to raw oysters. The restaurant's handling of other food products, especially those with requirements similar to oysters, is relevant to the issues.

The evidence presented by Bissinger relates to failures to observe required regulations during a time frame near to Mr. Bissinger's dining there on May 8, 2006. Metro Health Inspector Danny Ripley testified about reports from restaurant inspections he conducted both before and after the date that Randall Bissinger patronized the buffet. For example, on December 20, 2005, New Country Buffet received a Health Inspection Score of 79 out of 100 because of an array of food safety violations. Among the listed requirements that the restaurant failed to meet was "[p]otentially hazardous food meets temperature requirements during storage, preparation, display, service, transportation." New Buffet's score improved to 82 after it was reinspected on May 2, 2006 (about six days before Randall Bissinger's fateful restaurant meal). In that inspection, however, the restaurant once again lost five points for the same failure to meet the temperature requirements for potentially hazardous food, and it lost an additional two points for failure to meet the requirement of "potentially hazardous food properly thawed."

Another inspection on August 24, 2006 resulted in the same score of 82, with the same two deficiencies mentioned above. On January 1, 2007, the restaurant's score

declined to 71, again with the same two critical deficiencies. The Health Department also embargoed food that was kept at improper temperatures during every inspection. During the inspection of December 20, 2005, it embargoed and discarded two pounds of roast pork. On May 2, 2006, it discarded one pound of roast pork and one pound of chicken. On August 24, 2006, it discarded four pounds of meat pasta, squid, and crab meat for "Severe Temperature Abuse." Danny Ripley's affidavit states that on that date, he "observed and inspected cold food on the buffet at hazardous temperatures including clams at 45.6 degrees, crab/fish at 60 degrees and cold cooked squid at 55 to 60 degrees."

Although the manager of New Country Buffet testified that any deficiencies noted by the Health Department had been corrected by employees, there is certainly evidence that proper temperature control was a problem on several sequential inspections, and Bissinger is entitled to the most favorable inferences from that evidence.

Thus, even though none of the cited reports specifically mention oysters, there is, as Bissinger asserts, a "mountain of circumstantial evidence" involving a pattern of unsafe food handling practices, from which a jury could reasonably infer that New Country Buffet improperly handled the raw oysters it obtained. *See Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn. 1976) (any material fact in a negligence case "may be proven by direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence."). Bissinger further contends that the reason oysters were not mentioned in the inspection reports was that, according to the affidavit of Shao Chai Chen, the restaurant does not add oysters to the buffet table until after 4:00 p.m., and the inspections were conducted at an earlier hour.

As we noted above, when ruling on a summary judgment motion, the trial court must consider the evidence presented in the light most favorable to the non-moving party, and must afford that party all the reasonable inferences that can be drawn from that evidence. *Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d at 307; *Draper*, 181 S.W.3d at 288; *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d at 196; *Memphis Housing Authority v. Thompson*, 38 S.W.3d at 507. "If there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." *Byrd v. Hall*, 847 S.W.2d at 211. In this case, it is reasonable to infer that if New Country Buffet has been negligent in its handling of every other category of food that it serves, it was also negligent in the way it handled the oysters that sickened Randall Bissinger.

Additionally, under the principles first announced in *Hannah v. Alltel*, supra, a defendant cannot obtain summary judgment by merely raising doubts about the pertinence of the plaintiff's evidence, but must satisfy a more stringent test:

To affirmatively negate an essential element of the nonmoving party's claim, [the movant] must point to evidence that tends to disprove a material factual allegation made by the nonmoving party. [the movant] cannot satisfy its burden of production with a conclusory assertion that the nonmoving party has no evidence or with presentation of evidence that raises doubts about the nonmoving party's ability to prove a claim. A trial court must dismiss the summary judgment motion if the moving party fails to satisfy this initial burden of production.

*Mills v. CSX Transportation, Inc.*, 300 S.W.3d 627, 631 (Tenn. 2009) .

In this case, New Buffet has, at best, raised a doubt as to whether Bissinger will be able to prove that the restaurant negligently handled the oysters that were served to his uncle. That is not sufficient to meet the restaurant's burden of production on a summary judgment motion under the standards announced in *Hannan v. Alltel, Miller v. CSX,* and other cases. Thus, the trial court did not err in declining to grant New Buffet summary judgment on Bissinger's negligence claim.

## B. Negligence Per Se

The distinction between common-law negligence and negligence per se is that common-law negligence is based on the general duty to act reasonably to avoid harming others, while negligence per se involves "more specific duties governing particular situations and relationships [that] may be imposed by the General Assembly." *Rains v. Bend of the River,* 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003) (citing *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)).

When the General Assembly enacts a penal statute, without explicitly creating a new cause of action for its breach, the courts may nonetheless find that in some situations a violation of the penal statute is also a violation of a civil legal duty, thereby establishing a possible cause of action for negligence per se. *Mitchell v. Ketner*, 393 S.W.2d 755, 757 (Tenn. Ct. App. 1964). However, not every violation of a penal statute triggers the negligence per se doctrine. *Rains v. Bend of the River,* 124 S.W.3d at 590.

Two threshold questions that must be answered before it can be determined whether the violation of a statute can trigger the negligence per se doctrine: whether the injured party is within the class of persons intended to benefit from or be protected by the statute, and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Rains v. Bend of the River,* 124 S.W.3d at 591 (citing *Harden v. Danek Medical, Inc.*, 985 S.W.2d 449, 452 (Tenn. Ct. App. 1998)).

–22–

There are also several other factors that the court should consider before applying the doctrine. Those factors include, "(1) whether the statute is the sole source of the defendant's duty to the plaintiff, (2) whether the statute clearly defines the prohibited or required conduct, (3) whether the statute would impose liability without fault, (4) whether invoking the negligence per se doctrine would result in damage awards disproportionate to the statutory violation, and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute." *Rains v. Bend of the River*, 124 S.W.3d 580, 591 (Tenn. Ct. App. 2003).

Bissinger's negligence per se claim is based upon allegations that New Country Buffet violated the Tennessee Food, Drug and Cosmetic Act of 1978, Tenn. Code Ann. § 53-1-101 et seq. The Act prohibits "the manufacture, sale, or delivery, holding or offering for sale of any food, drug, device or cosmetic that is adulterated or misbranded." Tenn. Code Ann. § 53-1-103(a)(1). It is a penal statute, because Tenn. Code Ann. § 53-1-103(b)(1) declares that violation of any of the provisions of Tenn. Code Ann. § 53-1-103(a) is a Class C misdemeanor.

We are unaware of any Tennessee cases upholding a negligence per se claim specifically based upon a violation of the Food, Drug and Cosmetic Act.[5] The courts of some other jurisdictions have, however, upheld such claims on the basis of similar statutes. *See*, for example, *Koster v. Scotch Associates*, 640 A.2d 1225, 1229 (N.J. Super. 1993); *Brumit v. Cokins*, 281 S.W.2d 154, 158 (Tex. Civ. App. 1955); *Peters v. Double Cola Bottling Co. of Columbia*, 224 S.C. 437, 443, 79 S.E.2d 710, 713 (S.C. 1954); *McKenzie v. Peoples Baking Co.*, 31 S.E.2d 154 (S.C. 1944); *Yochem v. Gloria, Inc.*, 17 N.E.2d 731 (Ohio 1938).

While Bissinger contends that the oysters sold by New Country Buffet meet the definitions of "adulterated food" found at Tenn. Code Ann. § 53-1-104(1)(C) and (D), New Country Buffet argues to the contrary that the oysters cannot be considered adulterated. We have, earlier in this opinion, held that Suppliers could not be held liable under the Products Liability Statute because the oysters were not "contaminated" under Tenn. Code Ann. § 53-1-104(1)(C) largely because *vibrio vulnificus* is present in nearly all oysters

There is a difference, however, with the claim against the restaurant. The difference lies in the relevant statutory definition and the evidence regarding the

---

[5] In *Jones v. Mercer Pie Co.,* the court did not use the expression "negligence per se," but we stated that the "evidence supports both the common law count of the declaration and the count charging a violation of the statute prohibiting the existence of unsanitary conditions in [a commercial bakery]." *Jones v. Mercer Pie Co.,* 214 S.W.2d at 49.

restaurants' practices in handling certain foods. Tennessee Code Annotated § 53-1-104(1)(C) defines food as adulterated if "it consists in whole or in part of a diseased, contaminated, filthy, putrid, or decomposed substance, or if it is otherwise unfit for food." Tenn. Code Ann. § 53-1-104(1)(D)'s definition of adulterated food includes the following:

> . . . if it is a potentially hazardous food, which would consist of meat, poultry, liquid eggs and partially cooked egg products, fish, milk and milk products, shellfish, . . . capable of supporting rapid and progressive growth of infectious or toxigenic micro-organisms and is transported, stored or offered for sale at a **product temperature in excess of forty-five degrees Fahrenheit (45° F)** if a cold food . . .

Due to the evidence recounted earlier with regard to temperature violations at the restaurant, Bissinger has clearly raised a question of material fact as to whether the oysters the restaurant served his uncle were adulterated under the definitions found at Tenn. Code Ann. § 53-1-104(1)(C) and (D), and thus whether the restaurant violated the statute. There can also be no doubt that Randall Bissinger was within the class of persons the Act was enacted to protect, or that the injury he suffered was of a type it was designed to prevent. We also note that the facts of this case are consistent with the factors set out by the *Rains* court for determining whether a claim can be sustained under the negligence per se doctrine.

We affirm the trial court's denial of summary judgment to New Country Buffet on the negligence per se claim.

**C. Failure to Warn**

There is no proof in the record that New Country Buffet passed along to its customers the suppliers' warnings about the dangers of eating raw oysters. The trial court noted that there was "no statutory duty to warn under the Tennessee regulatory scheme," and stated the issue is whether there is a common law duty.

Bissinger's claims of breach of a duty to warn are argued under various causes of action. Breach of a duty to warn is not a free-standing claim, but rather an element that may apply to a number of different types of claims, including simple negligence and various product liability claims. *See Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 542 (Tenn. 2008) (manufacturer who becomes aware that a product is defective or unreasonably dangerous must take reasonable steps to warn consumers who purchased the product); *Pittman v. Upjohn Co.*, 890 S.W.2d 425 (Tenn. 1994) (describing the scope of the duty to warn borne by the drug manufacturer and the prescribing physician); *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 135 (Tenn. 2001) (medical center had a duty to

–24–

warn patient of possible exposure to HIV); *Trimble v. Irwin*, 441 S.W.2d 818, 820 (Tenn. Ct. App. 1968) (manufacturer of floor finishing chemicals had duty to warn of their dangerous volatile characteristics).

Warnings are not always necessary, however. Tennessee Code Annotated § 29–28–105(d) states that "[a] product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user." *See, also*, *Eaton v. McLain,* 891 S.W.2d 587, 595 (Tenn. 1994) (no duty to warn of danger of unlighted stairs in premises liability case); *Shoemake v. Omniquip Int'l, Inc*., 152 S.W.3d 567, 574 (Tenn. Ct. App. 2003). Further, the law does not impose a duty to warn of risks that are widely known. *Pemberton v. American Distilled Spirits Co.*, 664 S.W.2d 690, 692 (Tenn. 1984) (seller of 100% grain alcohol had no duty to warn customer of the effects of consuming a large quantity of it in undiluted form).

The proof showed that there is no difference between the appearance, smell or taste of a raw oyster that is safe to eat and one that contains large quantities of *vibrio vulnificus*. Thus, we cannot say that the danger of the product was open and obvious. It could be argued that the danger of eating raw oysters is well-known to the public. But, it may be that the extent of that danger is not as well-known. The courts of other jurisdictions have acknowledged the significance of this distinction.

For example, in *Edwards v. Hop Sin, Inc*, 140 S.W.3d at 17, a customer with a bad liver condition suffered severe septicemia from eating raw oysters. The trial court held that the defendant restaurant was entitled to summary judgment, because a reasonable consumer is probably aware that raw seafood poses a certain risk of mild illness. But the appeals court reversed, holding that most people were probably not aware of the greater risk of serious illness or death for those with stomach, liver, or blood conditions, or with compromised immune systems. The court concluded that because of that risk, it was a question for the jury whether the restaurant could be held liable for failing to pass along to its customers the warnings that its suppliers furnished with their product. *See also Simeon v. Doe*, 618 So.2d at 852 (holding that there was a danger inherent in the normal use of the product that was not within the knowledge of an ordinary user, and that given the magnitude of the potential harm to a vulnerable person, a warning was particularly necessary if the vendor was aware of the risk). The restaurant was on notice here, because of the warning notices on the bags from Suppliers.

*Ayala v. Bartolome,* 940 S.W.2d 727, 732 (Tex. Ct. App. 1997), involved another man who suffered from cirrhosis of the liver and who died after eating raw oysters. In that case, the Texas appeals court reversed the summary judgment for the defendant restaurant. The court acknowledged the defendant's contention that it was common knowledge to the public that eating uncooked meat carries an element of danger, but it stated that "it is not

–25–

common knowledge that eating raw oysters could be fatal." The court accordingly concluded that it was a question of fact for the jury whether the oysters the defendant served were defective or unreasonably dangerous.

The above cases and others of similar import stand as strong persuasive authority that given the current state of knowledge about the dangers of *vibrio vulnificus* in oysters, New Country Buffet had a duty to warn its customers about those dangers. We affirm the trial court's determination that the restaurant was not entitled to dismissal on summary judgment of claims based on failure to warn.

## VI. OTHER CLAIMS AGAINST RESTAURANT

Aside from the common-law negligence claims against New Country Buffet, the trial court declined to grant the restaurant summary judgment on Bissinger's other claims, which included product liability and breach of implied warranty of merchantability.

As we discussed above, a manufacturer or seller may be held liable under the Tennessee Products Liability Act for injuries resulting from the use of a product if the product is found to have been defective or unreasonably dangerous when it left the control of the manufacturer or seller. Tenn. Code Ann. § 29-28-105.

The restaurant insists that the oysters it served were not defective or unreasonably dangerous. Its sole argument is based on the rebuttable presumption that a product is not unreasonably dangerous if the manufacturer or seller can demonstrate compliance with federal or state statutes or administrative regulations creating relevant standards for a product's "design, inspection, testing, manufacturing, labeling, warning or instructions." Tenn. Code Ann. § 29-28-104(a). The trial court held that the defendant suppliers were entitled to that presumption, because the evidentiary material they submitted indicated that their handling of the oysters satisfied the federal regulations governing seafood safety, and because Bissinger did not offer any countervailing evidence.

The restaurant insists that it is entitled to the same presumption, because "there is no evidence that it broke any federal or state law regarding the maintenance, storage, sale and distribution/display of the oysters in this case." However, that insistence misstates the circumstances in which the presumption applies. The party claiming the presumption has the burden to show compliance with applicable statutes and regulations; it is not the burden of the plaintiff to show the opposite. New Country Buffet did not provide evidence that demonstrated compliance. Thus, the restaurant is not entitled to the presumption that the oysters it served were not unreasonably dangerous, and its argument is without merit.

With or without the presumption, the question is whether the oysters were defective or unreasonably dangerous when served. As discussed earlier, the same evidence is relevant to whether the oysters were unfit for consumption and, therefore, not merchantable.

Bissinger also claimed that New Country Buffet violated the implied warranty of merchantability by serving oysters that "were contaminated with *vibrio vulnificus* and were therefore unmerchantable and unfit for human consumption." *See* Tenn. Code Ann. § 47-2-314. New Country Buffet asserts on appeal "that it should have been granted summary judgment on this claim as the raw oysters in question <u>were</u> merchantable, wholesome and fit for human consumption." (emphasis in original statement).

Based upon the same authorities and standards that we discussed with regard to Suppliers, the restaurant argues that because *vibrio vulnificus* is natural to shellfish, their oysters should be deemed to have passed the two tests that are normally applied to determine whether food is suitable for sale and consumption.

Under the foreign-natural test, food is considered unfit for ordinary purposes if an object is found in the food that does not occur naturally. There are no allegations in the record that such an object made the oysters unfit. Under the reasonable expectations test, food is considered unfit for ordinary purposes if it contains substances which cause injury and which the consumer would not reasonably expect to find in the product, even if those substances are natural. Such substances might include a chicken bone found in a chicken enchilada or a walnut shell in walnut ice cream. For an extensive discussion of cases from many jurisdictions involving both kinds of impurities, *see Mexicali Rose v. Superior Court,* 822 P.2d 1292 (Cal. 1992).[6]

New Country Buffet argues that because *vibrio vulnificus* occurs naturally, the restaurant cannot be found liable under the foreign-natural test, and that since the proof shows that *vibrio* is found in virtually all oysters, a consumer cannot reasonably expect to receive a oyster free from the bacteria.

For these or similar reasons, we held that Suppliers could not be held liable under either product liability or implied warranty of merchantability. The same basic legal principles apply to New Country Buffet. However, if New Country was, in fact, negligent in its handling of the oysters, its conduct may have allowed the bacteria to proliferate. Thus, actions of the restaurant may have rendered the oysters unfit for consumption. As

---

[6] The cited cases involving discussion of the foreign/natural test and the reasonable expectations test do not generally involve claims of violation of the warranty of merchantability, but rather other theories of recovery, such as strict liability, res ipsa loquitur and negligence per se.

discussed earlier, Tenn. Code Ann. § 53-1-104(1)(D) defines adulterated food as including shellfish capable of supporting rapid and progressive growth of infectious or toxigenic micro-organisms that is stored or offered for sale at a temperature greater that forty-five degrees Fahrenheit (45° F).

Because of the testimony of the temperature findings of inspectors, including the specific temperatures cited therein, it may be possible for Bissinger to establish that the oysters consumed by his uncle were adulterated and, thus, unfit for consumption and unreasonably dangerous.  At present, there is no proof of the concentration of vibrio when the oysters were delivered to the restaurant or the concentration when the oysters were served.  However, while it may be difficult for Bissinger to establish an increase, that question is not before us at this time.

The trial court did not err in declining to grant New Country Buffet's summary judgment on his claims of products liability or breach of the implied warranty of merchantability.

## VII.  ATTEMPTS TO ASSERT FAULT AGAINST ADDITIONAL PARTIES

Gulf Pride and New Country Buffet argue on appeal that the trial court erred in denying their attempts to assert fault against non-parties.  The case management and scheduling orders found in the record show that the motions and pleadings at issue were filed long after the expiration of deadlines set by the trial court to move the case along in an expeditious manner.

The trial court's order of June 19, 2007 gave the defendants until October 12, 2007, to fully review the medical records to determine whether to name any additional parties as at fault for the plaintiff's injuries, and until November 13, 2007 to amend their answers to allege any such fault by those additional parties.  After the deadline passed, with no defendant asserting fault against a non-party, the defendants sought a further extension of the deadline.  The court granted the defendants an extension until February 1, 2008 and a further deadline until April 1, 2008.  Those deadlines also passed with no assertions of fault made against a non-party.

On June 15, 2009, more than a year after the expiration of the last deadline, Gulf Pride attempted to assert fault against three out-of-state entities that were involved in the harvesting of oysters.  Bissinger filed a motion to strike those defenses, which Judge McClendon granted, stating that they were inexcusably untimely and that the plaintiff "would be significantly and unfairly prejudiced if the Defendants were permitted to assert fault against non-parties at this point, more than two years into litigation of this case."

Judge McClendon subsequently recused herself, and the case was assigned to Judge Gayden. On November 29, 2010, after Judge Gayden assumed responsibility for the case, Gulf Pride attempted to amend its answer to Bissinger's third amended complaint by adding as an affirmative defense the comparative fault of the same non-party oyster harvesters it had designated earlier, as well as unnamed doctors and medical professionals at the VA hospital whom Gulf Pride alleged were negligent for not advising Randall Bissinger of the dietary restrictions he should have followed in light of his medical condition.

New Country Buffet attempted to raise the same affirmative defense in its own answer, which was filed on January 10, 2011. The restaurant named as "necessary and indispensable parties" the same oyster harvesters that had been named by Gulf Pride, and as well as four specifically-named medical providers who had allegedly "failed to diagnose and inform Randall Bissinger that he suffered from cirrhosis of the liver and should therefore restrict his diet to exclude certain foods, including raw oysters."

Bissinger filed separate motions to strike the portions of Gulf Pride's and New Country Buffet's answers that asserted affirmative defenses based upon the fault of previously unnamed non-parties. After hearings on both motions, the trial court granted the relief Bissinger asked for. Both of the court orders granting Bissinger's motions to strike cited four reasons, set out in *Hardcastle v. Harris*, 170 S.W.3d 67 (Tenn. Ct. App. 2004), why permitting the proposed amendments would be unfairly prejudicial to Bissinger. The *Hardcastle* opinion stated that naming additional parties might be prejudicial if it would likely "(1) cause additional expense and the burden of a more complicated and lengthy trial, (2) require the opposing party to engage in significant additional pre-trial preparation, (3) unduly increase discovery, or (4) unduly delay the trial." *Hardcastle v. Harris*, 170 S.W.3d at 81.

Gulf Pride argues on appeal that several recent decisions of the Tennessee Supreme Court and of this court have expanded the rights of both plaintiffs and defendants in cases involving comparative fault to allege that previously unnamed individuals or entities were at fault for the plaintiff's injuries. *See Mills v. Fulmarque, Inc.*, 360 S.W.3d 362 (Tenn. 2012); *BellSouth Telecommunications, Inc. v. Young*, W2010-01825-COA-R3-CV, 2011 WL 2462996 (Tenn. Ct. App. June 21, 2011) (rule 11 perm. app. denied Oct. 24, 2011).

Gulf Pride's proposed amendment in this case was filed almost three years after the expiration of the trial court's final deadline for asserting fault against additional parties. There can be no doubt that allowing additional parties to be brought into the case at that stage of the proceedings would have resulted in Bissinger suffering all four of the prejudicial effects cited in *Hardcastle v. Harris*. Therefore, the trial court did not abuse its

–29–

discretion in granting Bissinger's motion to strike the relevant paragraphs in Gulf Pride's amended answer.

For its part, New Country Buffet argues that the trial court incorrectly struck its affirmative defense using the *Hardcastle v. Harris* standard, because its pleading stood in a different posture than did Gulf Pride's motion to amend. The restaurant points out that Gulf Pride's allegations of fault against additional non-parties were included in its motion to amend its answer, and that the issue in *Hardcastle* involved a motion to amend a complaint. In contrast, New Country Buffet had not previously filed an answer to Bissinger's third amended complaint, so the restaurant contends that the decision on Bissinger's motion to strike certain paragraphs from its unamended answer should have been based on the provisions of Tenn. R. Civ. P. 12.06, rather than on the factors set out in *Hardcastle v. Harris*.

It appears to us, however, that under the circumstances of this case, that is a distinction without a difference. Tenn. R. Civ. P. 12.06 allows a court, upon motion of a party, or upon its own motion, to "order stricken from any pleading insufficient defense or any redundant, immaterial, impertinent or scandalous matter." This court set out the standards for decision on a motion to strike under Tenn. R. Civ. P. 12.06 in *Doe v. Mama Taori's Premium Pizza, LLC,* M1998-00992-COA-R9-CV, 2001 WL 327906 (Tenn. Ct. App. Apr. 5, 2001). To succeed on such a motion,

> . . . the moving party must show both that the challenged claim or defense does not involve a question of fact or law on which the non-moving party can succeed and that failure to strike the challenged claim or defense will be prejudicial to the moving party. Prejudice for the purpose of a Tenn. R. Civ. P. 12.06 motion arises when the challenged claim or defense has the effect of confusing the issues or is so lengthy and complex that it places an undue burden on the moving party.

*Doe v. Mama Taori's Premium Pizza, LLC,* 2001 WL 327906 at *3.

The paragraphs in New Country Buffet's answer that were the target of Bissinger's motion to strike were based on Bissinger's statement in his third amended complaint that Randall Bissinger was not diagnosed with cirrhosis until after he contracted *vibrio vulnificus*. That information was available to New Country Buffet when it examined the medical records in 2007. Likewise, the oyster harvesters were, or could have been, identified during the discovery period.

We conclude that the trial court did not abuse its discretion in granting Bissinger's motion to strike the affirmative defenses in New Country Buffet's answer.

–30–

## VIII. CONCLUSION

The judgment of the trial court is affirmed in all respects except for its denial of Suppliers' motion for summary judgment on the failure to warn issue, which ruling is reversed. We remand this case to the Circuit Court of Davidson County for further proceedings. Divide the costs on appeal equally among Randall Bissinger, New Country Buffet Restaurant, Gulf Pride Seafood, Bon Secour, and Leavins.

_____

PATRICIA J. COTTRELL, JUDGE